# UNITED STATES DISTRICT COURT

# IN THE EASTERN DISTRICT OF MICHIGAN

GLORIA GROVER, RAUL VELASCO,
MARY MAY, RICHARD WOLF,
TINA REINIG, CARL SWARTHOUT,
SHANE NICKERSON, MARK LICKTEIG,
VIVIAN KIPFMILLER, PATRICK WATERMAN,
BRIAN PARENT, LAWRENCE DUREK,
KARIE DINGMAN, JOSEPH KRUEGER,
CLEORIA FRENCH, TERRY VISNAW,
LORI FEINAUER, JARED BRUNER,
and MARQUETTA MAXWELL,
individually and all others similarly situated,

Case No.:

      Plaintiffs,

Hon.

v.

WILLIAM D. BOYCE TRUST 2350 u/a/d
10/1908, WILLIAM D. BOYCE
TESTAMENTARY TRUST 3649 u/a/d
6/1929, WILLIAM D. BOYCE
TESTAMENTARY TRUST 3650 u/a/d
6/1929, LEE W. MUELLER, MICHAEL W.
d'AVENAS, STEPHEN B. HULTBERG,
JPMORGAN CHASE & CO., BOYCE TRUST
HYDRO PROPERTY 2350 LLC, BOYCE
TRUST HYDRO PROPERTY 3649 LLC,
BOYCE TRUST HYDRO PROPERTY 3650
LLC, BOYCE HYDRO POWER LLC,
BOYCE HYDRO LLC, BOYCE MICHIGAN
LLC and EDENVILLE HYDRO PROPERTY
LLC, Jointly and Severally,

      Defendants,

## PLAINTIFFS' CLASS ACTION COMPLAINT AND JURY DEMAND

1

**NOW COMES** the Plaintiffs, GLORIA GROVER, RAUL VELASCO, MARY MAY, RICHARD WOLF, TINA REINIG, CARL SWARTHOUT, SHANE NICKERSON, MARK LICKTEIG, VIVIAN KIPFMILLER, PATRICK WATERMAN, BRIAN PARENT, LAWRENCE DUREK, KARIE DINGMAN, JOSEPH KRUEGER, CLEORIA FRENCH, TERRY VISNAW, LORI FEINAUER, JARED BRUNER and MARQUETTA MAXWELL, (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated, by and through their attorneys, BUCKFIRE & BUCKFIRE, P.C., sue Defendants WILLIAM D. BOYCE TRUST 2350 u/a/d 10/1908, WILLIAM D. BOYCE TESTAMENTARY TRUST 3649 u/a/d 6/1929, WILLIAM D. BOYCE TESTAMENTARY TRUST 3650 u/a/d 6/1929 (collectively, "Trust Defendants"), LEE W. MUELLER, MICHAEL W. d'AVENAS, STEPHEN B. HULTBERG, JPMORGAN CHASE & CO. (collectively, "Trustee Defendants"), and BOYCE TRUST HYDRO PROPERTY 2350 LLC, BOYCE TRUST HYDRO PROPERTY 3649 LLC, BOYCE TRUST HYDRO PROPERTY 3650 LLC, BOYCE HYDRO POWER LLC, BOYCE HYDRO LLC, BOYCE MICHIGAN LLC, and EDENVILLE HYDRO PROPERTY LLC (collectively, "LLC Defendants"), and allege as follows:

## I.  NATURE OF THE ACTION

1.      Plaintiffs bring this action on behalf of themselves and all others who have similarly suffered from flooding, devastation and physical invasion of their property by water, pollutants, dirt and debris on May 19, 2020 as a result of the Edenville and Sanford Dams failing thereby causing material injury to their well-being, properties and belongings.

2.      The breach was reported by Midland County 911 at approximately 5:43 p.m. and an immediate evacuation was ordered for residents of Sanford and Edenville, including

residents of Midland living west of Eastman Road and south of U.S. 10. Residents were told to go as far east and west of the Titabawassee River as possible.

3.      The resulting release of water from the failed Dams was immense, persistent and had catastrophic consequences to anything and everything in its way. Floodwaters were projected to reach 30 feet high.

4.      Shelters for evacuees were set up at Meridian Junior High School and Coleman High School. It was estimated that 10,000 people would be evacuated or affected.

5.      Governor Gretchen Whitmer declared a state of emergency, which was followed by the President of the United States of America doing the same.

6.      As fully set forth herein, Defendants knew or should have known that the Dams could not sustain a major flood event; yet they wholly failed to remedy these persistent issues.

7.      There are many persons who have been similarly affected and the question to be determined is one of common and general interest to many persons constituting the class to which Plaintiffs belong, and is so numerous as to make it impracticable to bring them all before the Court, for which reason Plaintiffs initiate this litigation for all persons similarly situated pursuant to FED. R. CIV. P. 23.

8.      Plaintiffs and the class members sustained personal injury, property damage, economic damage, and emotional injury as a result of Defendants' negligent conduct, as described herein, and set forth in more detail below. Plaintiffs bring this action against the Defendants, individually and on behalf of the Class, for injunctive and declaratory relief, and to recover compensatory and punitive damages, and for any other remedies or relief allowed by law.

## II.  JURISDICTION AND VENUE

9.      This Court has original jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d). This is a class action in which the aggregate claims of the individual Class members exceed the sum value of $5,000,000 exclusive of interest and costs; there are believed to be in excess of 100 Class members, and Plaintiffs (and many Class Members) and Defendants are citizens of different states.

10.     The Court is empowered to issue a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202.

11.     Personal jurisdiction also applies to Defendants because Defendants have purposefully availed themselves of the privilege of conducting activities in the State of Michigan. They have therefore established minimum contacts sufficient to confer jurisdiction over them; and the assumption of jurisdiction over Defendants will not offend traditional notions of fair play and substantial justice and is consistent with the Constitutional requirements of due process.

12.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events and omissions giving rise to this action occurred in this District, Defendants' operations in this District resulted in catastrophic flooding within this District, causing harm to Plaintiffs and Class Members residing in this District.

## III.  PARTIES

13.     Plaintiff Gloria Grover is a citizen of the State of Michigan with a property located at 7021 Ronald Drive, Saginaw, Michigan. Due to the Edenville and Sanford Dam failures, her home has been flooded and the in-ground pool collapsed. The home is believed to be a total loss.

14.     Plaintiff Raul Velasco is a citizen of the State of Michigan with a property located at 7670 Trinklein Road, Saginaw, Michigan.  Due to the Edenville and Sanford Dam failures, his home has been overwhelmed with approximately six feet of standing water.

15.     Plaintiff Mary May is a citizen of the State of Michigan with a property located at 3995 East Street, Saginaw, Michigan. Her home and personal property suffered significant damage as a result of the Edenville and Sanford Dam failures.

16.     Plaintiff Richard Wolf is a citizen of the State of Michigan with a property located at 3824 N. Saginaw, Midland, Michigan. As a result of the Edenville and Sanford Dam failures, his home has been flooded up to the second floor.

17.     Plaintiff Tina Reinig is a citizen of the State of Michigan with a property located at 3919 Pfeiffer Court, Midland, Michigan. Her home and personal property suffered significant damage as a result of the Edenville and Sanford Dam failures.

18.     Plaintiff Carl Swarthout is a citizen of the State of Michigan with a property located at 4028 Dorothy Drive, Midland, Michigan.  His property was washed away as a result of the Edenville and Sanford Dam failures.

19.     Plaintiff Shane Nickerson is a citizen of the State of Michigan with a property located at 11 Iota Place, Saginaw, Michigan.  His home and property have been overwhelmed by 44 inches of standing water as a result of the Edenville and Sanford Dam failures.

20.     Plaintiff Mark Lickteig is a citizen of the State of Michigan with a property located at 5431 Oakridge Drive, Beaverton, Michigan. His home and personal property suffered significant damage as a result of the Edenville and Sanford Dam failures.

21.     Plaintiff Vivian Kipfmiller is a citizen of the State of Michigan with a property located at 5732 Irene Drive, Beaverton, Michigan. Her home and personal property suffered significant damage as a result of the Edenville and Sanford Dam failures.

22.     Plaintiff Patrick Waterman is a citizen of the State of Michigan with a property located at 5533 Red Oak Drive, Beaverton, Michigan.  As a result of the Edenville and Sanford Dam failures, he has three feet of standing water in his house.

23.     Plaintiff Brian Parent is a citizen of the State of Michigan with a property located at 4913 Glencoe Street, Midland, Michigan. As a result of the Edenville and Sanford Dam failures, he has four feet of standing water in his house.

24.     Plaintiff Lawrence Durek is a citizen of the State of Michigan with a property located at 3009 Pomranky Road, Midland, Michigan. His home and property were destroyed as a result of the Edenville and Sanford Dam failures.

25.     Plaintiff Karie Dingman is a citizen of the State of Michigan with a property located at 1038 South River Road, Saginaw, Michigan. Her home and personal property suffered significant damage as a result of the Edenville and Sanford Dam failures.

26.     Plaintiff Joseph Krueger is a citizen of the State of Michigan with a property located at 5087 Wixom, Beaverton, Michigan. His home and personal property suffered significant damage as a result of the Edenville and Sanford Dam failures.

27.     Plaintiff Cleoria French is a citizen of the State of Michigan with a property located at 5245 Pheasant Run Drive, Saginaw, Michigan. Her home and personal property suffered significant damage as a result of the Edenville and Sanford Dam failures.

28.     Plaintiff Terry Visnaw is a citizen of the State of Michigan with a property located at 1777 South River Road, Saginaw, Michigan. His home and personal property suffered significant damage as a result of the Edenville and Sanford Dam failures.

29.     Plaintiff Lori Feinauer is a citizen of the State of Michigan with a property located at 2408 Pomranky Road, Midland, Michigan. Her home and personal property have been destroyed as a result of the Edenville and Sanford Dam failures.

30.     Plaintiff Jared Bruner is a citizen of the State of Michigan with a property located at 517 Bark Lane, Midland, Michigan. His home and personal property have been destroyed as a result of the Edenville and Sanford Dam failures.

31.     Plaintiff Marquetta Maxwell is a citizen of the State of Michigan with a property located at 5395 South Oakridge Drive, Beaverton, Michigan. Her home and personal property suffered significant damage as a result of the Edenville and Sanford Dam failures.

32.     Defendant William D. Boyce Trust 2350 u/a/d 10/1908 is an Illinois-registered Trust. It is a member owner of each of the LLC Defendants, in conjunction with the other Trust Defendants. At all times relevant, Defendant William D. Boyce Trust 2350 has been engaged in a joint venture with the other Trust Defendants and the LLC Defendants to own and operate the Edenville and Sanford Dams. Additionally, at all times relevant hereto, the LLC Defendants have been alter egos of the Trustee Defendants and the Trust Defendants.

33.     Defendant William D. Boyce Trust 3649 u/a/d 06/1929 is an Illinois-registered Trust. It is a member owner of each of the LLC Defendants, in conjunction with the other Trust Defendants. At all times relevant, Defendant William D. Boyce Trust 3649 has been engaged in a joint venture with the other Trust Defendants and the LLC Defendants to own and operate the

Edenville and Sanford Dams. Additionally, at all times relevant hereto, the LLC Defendants have been alter egos of the Trustee Defendants and the Trust Defendants.

34.     Defendant William D. Boyce Trust 3650 u/a/d 06/1929 is an Illinois-registered Trust. It is a member owner of each of the LLC Defendants, in conjunction with the other Trust Defendants. At all times relevant hereto, Defendant William D. Boyce Trust 3650 has been engaged in a joint venture with the other Trust Defendants and the LLC Defendants to own and operate the Edenville and Sanford Dams. Additionally, at all times relevant hereto, the LLC Defendants have been alter egos of the Trustee Defendants and the Trust Defendants.

35.     Defendant Lee W. Mueller is a citizen of Nevada. He is sued personally as co-trustee and beneficiary of the Trust Defendants, and personally as member and co-manager of the LLC Defendants. At all times relevant hereto, Lee W. Mueller has been engaged in a joint venture with the Trust Defendants and LLC Defendants to own and operate the Edenville and Sanford Dams. Additionally, at all times relevant hereto, the LLC Defendants have been alter egos of Lee W. Mueller.

36.     Defendant Michael d'Avenas is a citizen of California. He is sued personally as co-trustee and beneficiary of the Trust Defendants. At all times relevant hereto, Michael d'Avenas has been engaged in a joint venture with the Trust Defendants and LLC Defendants to own and operate the Edenville and Sanford Dams. Additionally, at all times relevant hereto, the LLC Defendants have been alter egos of Michael d'Avenas.

37.     Defendant Stephen B. Hultberg is a citizen of Nevada. He is sued personally as co-trustee and beneficiary of the Trust Defendants, and personally as member and co-manager of the LLC Defendants. At all times relevant hereto, Stephen B. Hultberg has been engaged in a joint venture with the Trust Defendants and LLC Defendants to own and operate the Edenville and

Sanford Dams. Additionally, at all times relevant hereto, the LLC Defendants have been alter egos of Stephen B. Hultberg.

38.     Defendant JPMorgan Chase & Co. is a Delaware Corporation with its principal place of business in New York. Upon information and belief, JPMorgan Chase & Co. is the successor in interest to Bank One Corporation and/or Bank One Trust Company NA following their merger in or about 2004. It is sued personally and directly as a co-trustee of the Trust Defendants. At all times relevant hereto, JPMorgan Chase & Co. has been engaged in a joint venture with the Trust Defendants and LLC Defendants to own and operate the Edenville and Sanford Dams. Additionally, at all times relevant hereto, the LLC Defendants have been alter egos of JPMorgan Chase & Co.

39.     Defendant Boyce Trust Hydro Property 2350 LLC is a Michigan limited liability company with its primary place of business in Gladwin County. It is wholly owned and operated by the Trust Defendants, and an alter ego of the Trust Defendants and Trustee Defendants. At all times relevant hereto, it has been in a joint venture with the other LLC Defendants and Trust Defendants to own and operate the Edenville and Sanford Dams.

40.     Defendant Boyce Trust Hydro Property 3649 LLC is a Michigan limited liability company with its primary place of business in Gladwin County. It is wholly owned and operated by the Trust Defendants, and an alter ego of the Trust Defendants and Trustee Defendants. At all times relevant hereto, it has been in a joint venture with the other LLC Defendants and the Trust Defendants to own and operate the Edenville and Sanford Dams.

41.     Defendant Boyce Trust Hydro Property 3650 LLC is a Michigan limited liability company with its primary place of business in Gladwin County. It is wholly owned and operated by the Trust Defendants, and an alter ego of the Trust Defendants and Trustee Defendants. At all

times relevant hereto, it has been in a joint venture with the other LLC Defendants and the Trust Defendants to own and operate the Edenville and Sanford Dams.

42.    Defendant Boyce Hydro Power LLC is a Michigan limited liability company with its primary place of business in Gladwin County. It is wholly owned and operated by the Trust Defendants, and an alter ego of the Trust Defendants and Trustee Defendants. At all times relevant hereto, it has been in a joint venture with the other LLC Defendants and the Trust Defendants to own and operate the Edenville and Sanford Dams.

43.    Defendant Boyce Hydro LLC is a Michigan limited liability company with its primary place of business in Gladwin County. It is wholly owned and operated by the Trust Defendants, and an alter ego of the Trust Defendants and Trustee Defendants. At all times relevant hereto, it has been in a joint venture with the other LLC Defendants and the Trust Defendants to own and operate the Edenville and Sanford Dams.

44.    Defendant Boyce Michigan LLC is a Michigan limited liability company with its primary place of business in Gladwin County. It is wholly owned and operated by the Trust Defendants, and an alter ego of the Trust Defendants and Trustee Defendants. At all times relevant hereto, it has been in a joint venture with the other LLC Defendants and the Trust Defendants to own and operate the Edenville and Sanford Dams.

45.    Defendant Edenville Hydro Property LLC is a Michigan limited liability company with its primary place of business in Gladwin County. It is wholly owned and operated by the Trust Defendants, and an alter ego of the Trust Defendants and Trustee Defendants. At all times relevant hereto, it has been in a joint venture with the other LLC Defendants and the Trust Defendants to own and operate the Edenville and Sanford Dams.

46.    In law and in fact, all of the Defendants own, operate, fund and maintain the Dams.

47.    Upon information and belief, the LLC Defendants had no separate existence other than as conduits for the Trust Defendants and Trustee Defendants, and the Trust Defendants and Trustee Defendants consistently held themselves out as individually conducting business affairs in connection with the ownership and operation of the Edenville and Sanford Dams without the proper use of corporate names and without identifying that their actions were taken as officers or employees of the various, respective LLC Defendants.

48.    Upon information and belief, the LLC Defendants: were insufficiently capitalized and maintained insufficient assets, including liability insurance coverage, considering the ultrahazardous ownership and operation of the Edenville and Sanford Dams as alleged more fully herein; were intermingling funds between and among themselves and the personal and/or trust assets of the Trust Defendants and Trustee Defendants in the ownership and operation of the Edenville and Sanford Dams; failed to have any functioning officers, directors, members and managers; failed to observe corporate formalities evidencing a distinction in fact between themselves and the Trust Defendants and Trustee Defendants; were mere instrumentalities of the Trust Defendants and Trustee Defendants in the ownership and operation of the Edenville and Sanford Dams; and were created, maintained and utilized for the express or implied purpose of committing negligent, careless, reckless, willful, wanton and malicious acts of wrongdoing with impunity by attempting to insulate the Trust Defendants and Trustee Defendants from potential liability in connection with the ownership and operation of the Edenville and Sanford Dams, thereby exposing Plaintiffs and all others similarly situated to unjust losses and damages as alleged herein.

49.    Additionally, the LLC Defendants, Trust Defendants and Trustee Defendants constituted a joint venture in connection with the Edenville and Sanford Dams inasmuch as they

agreed to undertake the ownership and operation of the Dams jointly for the purpose of sharing associated profits and losses, and in connection therewith, each contributed their respective skills, property or resources in exercising control or a right of control over the Dams.

## IV.  GENERAL ALLEGATIONS

### *MAY 19, 2020 DAM FAILURE AND FLOODING*

50.    The catastrophe giving rise to this lawsuit involves the failure of several dams along the Tittabawassee River, the first of which was the Edenville Dam — with the structure collapsing — at about 5:45 p.m. on Tuesday, May 19, 2020.

51.    The Edenville Dam was constructed in 1924 for the purpose of water power development to generate electricity. The Dam width consists of earthen embankments totaling about 6,600 ft and having a maximum height of 54.5 ft. The project spans both the Tittabawassee and Tobacco Rivers, creating a 2,600-acre reservoir known as Wixom Lake, with a gross storage capacity of about 40,000 acre-feet and a 49-mile-long shoreline at full pool.

52.    On or about May 19, 2020, amid days of rain, water levels continued to rise in the reservoir behind the Edenville Dam. Eventually, the Edenville Dam failed causing massive flooding and forcing the evacuation of approximately 10,000 residents.

53.    Video of the incident shows that during the initial stages of the failure, spill water can be seen trickling down from the top, but the crest starts to degrade and deform.  At the same time, an unsettling bulge appeared near the bottom[1]:

---

[1] Still image taken from https://www.mlive.com/news/saginaw-bay-city/2020/05/video-shows-michigan-dam-break-as-it-happened-catastrophic-is-the-only-thing-i-can-call-it.html (accessed May 27, 2020).



54.   Then, the entire dam collapsed in what looked like a fast-moving landslide[2]:



---

[2] Still image taken from https://www.mlive.com/news/saginaw-bay-city/2020/05/video-shows-michigan-dam-break-as-it-happened-catastrophic-is-the-only-thing-i-can-call-it.html (accessed May 27, 2020).

55.     Breaching of the Edenville Dam caused Wixom Lake to empty, and that water traveled towards Sanford Lake, increasing the amount of water passing through Sanford Dam.

56.     The below-photograph shows the now-emptied Wixom Lake[3]:



57.     The Sanford Dam was next in line and also failed, resulting and expanding the flood area that reached all the way to Midland and beyond.

58.     By Tuesday, the Dams on Sanford and Wixom Lakes were no longer being able to control or contain the amount of water flowing through the spill gates. These included the 69-foot-wide, 39-foot-high Tittabawassee spillway (also referred to as the Edenville spillway) located on the eastern side of the project and containing three Tainter gates and two low-level sluice gates. And the Tobacco spillway, which is about 72 feet long and 72 feet wide with a crest height of about 40 feet, and containing three Tainter gates located on the western side of the project. The

---

[3] Still image taken from https://www.youtube.com/watch?v=sX8I3jzWakg (accessed May 27, 2020).

project creates a 0.4-mile-long bypassed reach on the Tobacco River that extends from the dam to the point where the Tobacco River meets the Tittabawassee River.

## DEFENDANTS' HISTORY OF NONCOMPLIANCE
## WITH FEDERAL REGULATORS

59.     The Edenville Dam, often referred to as the Edenville Project, operated under license No. 10808 pursuant to section 31(b) of the Federal Power Act ("FPA"). The license includes terms and conditions concerning dam safety, property rights, water quality, public recreation and safety, and other project purposes.

60.     The Edenville Project was originally licensed to Wolverine Power Corporation on October 16, 1998. The license was transferred from Wolverine Power Corporation to Synex Michigan, LLC on June 23, 2004. Synex Michigan, LLC changed its name to Boyce Hydro Power, LLC and filed a statement with the U.S. Federal Energy Regulatory Commission ("FERC") on July 12, 2007 to this effect. In addition to the Edenville Project, Defendant Boyce Hydro Power, LLC and the other Defendants own and operate the Sanford Project No. 2875, Secord Project No. 10809, and Smallwood Project No. 10810.

61.     In total, Defendants own four dams on the Tittabawassee River, which run southeasterly through mid-Michigan, emptying into the Saginaw River at Saginaw and which create Wixom, Sanford, Secord and Smallwood lakes.

62.     Defendants have a long history with the FERC and the Edenville Dam Project and their failing for several years to implement measures needed to protect public safety

63.     For over *fourteen years*, federal regulators warned Defendants of the structural inadequacies of the Edenville Dam. Of particular concern was the Project's inability to pass the Probable Maximum Flood ("PMF") due to inadequate spillway capacity.[4]

64.     The Commission's Dam Safety Guidelines required the project works to be designed to safely handle a flood up to the PMF either by withstanding overtopping of the loading condition during such a flood or alleviating the risk such that dam failure would no longer constitute a hazard to downstream life or property.

65.     For years leading up to the current disaster, spillway capacity at the Edenville Project could only pass about 50 percent of the PMF.

66.     Unfortunately, the Commission's warnings went ignored which ultimately culminated in the revocation Defendants' license to generate hydroelectricity at the Edenville Dam pursuant to section 31(b) of the FPA.  Pursuant to the September 10, 2018 Order revoking the license issued by the FERC, the action was taken "because of Boyce Hydro Power, LLC's . . . longstanding failure to increase the project's spillway capacity to safely pass flood flows, as well as its failure to comply with its license, the Commission's regulations, and a June 15, 2017 Compliance Order issued pursuant to FPA section 31(a)."[5]

67.     According to the September 10, 2018 Order revoking the license, the FERC noted:

*In sum, Boyce Hydro has, for more than a decade, knowingly and willfully refused to comply with major aspects of its license and the Commission's regulatory regime, with the result that public safety has been put at risk and the public has been denied the benefits, particularly project recreation, to which it is entitled. The record demonstrates that there is no reason to believe that Boyce Hydro will come into compliance; rather, the licensee has displayed a history of*

---

[4] The "PMF event" is the flood that may be expected from the most severe combination of critical meteorologic and hydrologic conditions that is reasonably possible in the drainage basin under study. The spillway capacity is the maximum outflow flood which a dam can safely pass.
[5] https://www.ferc.gov/CalendarFiles/20180910172800-P-10808-058.pdf (accessed May 29, 2020).

***obfuscation and outright disregard of its obligations***. We do not often revoke a license, but the licensee has left us with no other way to vindicate the public interest here. We are mindful of the concerns of the local community, which has suffered the results of Boyce Hydro's malfeasance. We conclude, however, that revoking the license will leave the community and state agencies increased authority to deal with Boyce Hydro's noncompliance with important dam safety requirements that have the potential to affect public safety and perhaps come to an acceptable arrangement as to how the lakes will be operated in the absence of hydropower generation.

For the above reasons, we find that, under section 31(b), Boyce Hydro knowingly violated its license, the 2017 Compliance Order and other Commission orders and regulations, and that it was given a reasonable time to comply before we commenced this revocation proceeding. Consequently, we revoke Boyce Hydro's license for the Edenville Project.

Within 15 days of the date of this order, the Boyce Hydro must permanently disable all generating equipment in the project's powerhouse and file written notification with the Secretary of the Commission, providing the date and time that generation ceased, the generator meter reading at that time, and a photograph of the reading on the meter. Following revocation of the license, the Commission's jurisdiction will end, and authority over the site will pass to Michigan DEQ for dam safety regulatory purposes.[6]

### *STATE OF MICHIGAN OVERSIGHT AND MANAGEMENT*

68.     Upon revocation of the FERC license, the dam became regulated by the Michigan Department of Environment, Great Lakes and Energy ("EGLE") and the Michigan Department of Natural Resources ("MDNR") under Part 315, Dam Safety, of the Natural Resources and Environmental Protection Act, MCL 324.31501, *et seq*.

69.     While under FERC licensure, the Edenville Dam had long been considered unsafe to downstream communities because its inadequate spillway capacity had rendered it barely able to satisfy one-half of the FERC 100% PMF standard.

---

[6] https://www.ferc.gov/CalendarFiles/20180910172800-P-10808-058.pdf (accessed May 29, 2020).

70.    However, on or about October 4, 2018, following the issuance of the FERC order revoking Defendants' license to generate hydroelectricity at the Edenville Dam, Jim Pawloski P.E., of the Michigan Hydrologic Studies and Dam Safety Unit Water Resources Division met with dam owners and performed an inspection of the dam. The dam was found to be in "fair" structural condition. However, on the date of the inspection, the water level in the impoundment (Wixom Lake) was surveyed and observed to be approximately 4.1 feet *below* its normal pool elevation.

71.    The Michigan inspector's report, dated October 8, 2018, concluded that the Dam's earthen embankments were "well maintained, with only a few bare spots, minor erosion, and no visible signs of significant distress," and its embankment drains appeared to be functioning and the two concrete spillways "showed signs of moderate deterioration . . . but appeared to be stable and functioning normally."[7]

72.    Rather than give credence to the years of documented findings that the spillways at the Edenville Dam were not sufficient to withstand the PMF, the State declared the dam and its spillways were in "fair structural condition." However, contrary to this assertion, emails and other evidence indicates that the State knew that the dam failed to even meet state safety regulations which are only half as strict as their federal counterpart.[8]

73.    Additionally, an authority called the Four Lakes Task Force ("FLTF") was created by resolutions passed in Midland and Gladwin Counties to administer and oversee the maintenance and operations of the four dams and reservoir. Prior to the Edenville Dam failure, FLTF signed a purchase agreement to acquire Defendants' dams, lake bottoms and related real estate of the lakes.

---

[7] https://www.michigan.gov/documents/egle/egle-EdenvilleDamInspection-10042018_691245_7.pdf (accessed May 29, 2020).
[8] https://www.detroitnews.com/story/news/local/michigan/2020/05/23/nessel-disputes-claim-state-litigation-played-role-edenville-dams-failure/5251215002/ (accessed May 28, 2020).

74.    The Task Force dam safety engineers issued a memorandum on September 18, 2019 to Lucas Trumble, P.E., purportedly one of only three personnel responsible for administering and enforcing the dam safety laws and regulations for the State. The memorandum summarized the gate tests that Defendants' dam safety engineer had previously performed in the presence of the FLTF's dam engineers at the Edenville Dam on June 14, 2019.

75.    The memorandum emphasized that "[t]he original Edenville Hydroelectric project was designed with six radial gates to allow for normal operation and to release floodwaters when lake elevations begin to rise after a rainfall event. The […] (FERC) requires that all high hazard dams be capable of safely passing 100% of the Probable Maximum Flood (PMF). EGLE requires safely passing the ½ PMF. Since the dam was designed and constructed prior to the time of FERC and EGLE regulation, the original design did not consider present day design capacity requirements."

76.    The memorandum concluded: "At this point in time, based on the documents reviewed, the FLTF does not believe that the Edenville Dam can be operated to meet the EGLE dam safety requirement to pass the ½ PMF without certain repairs and improvements."

77.    Moreover, the dam safety engineers of the dam's prospective acquiror (FLTF) allegedly determined that the 95-year-old high hazard embankment dam would fail to meet even the State of Michigan's 50% PMF standard, in light of not only its historically inadequate spillway capacity, but also its old age and the poor condition of its critically important gates and hoisting equipment.

78.    Rather than heed the warnings of years of inspections and warnings from FERC, or the recent engineering opinions, MDNR allegedly sent a letter on October 2, 2019 to EGLE. The letter opposed interim measures previously approved by FERC to reduce the risk of flooding,

including drawdowns of the Wixom reservoir, because of the concern for freshwater mussels and fish.

79.    On November 20, 2019, Keto Gyekis, the Coordinator of EGLE's Wetland Identification Program, allegedly submitted comments to the MDNR concerning proposed drawdowns of the Wixom reservoir to avoid or reduce the risks of flooding. Gyekis reportedly wrote:

> Research has shown that […] large scale cold-season drawdowns within impoundments are often associated with negative ecological effects. Various biological, chemical, and physical changes within the littoral zone during a large-scale cold-season drawdown can indirectly affect ecological condition within the rest of the impoundment. […] A drawdown after the cold-season commences can expose […] hibernating animals to very cold dry air, where they can desiccate irreversibly.

80.    Gyekis allegedly further wrote:

> Rainbow mussel (*Villosa iris*), is a State-listed Special Concern species that is suspected to inhabit the upper end of the Tobacco River portion of the Wixom Lake where there is normally some lotic current. State/Federal mussel maps indicate that this species also likely inhabits more than a mile segment of the Tobacco River adjacent to the north end of the reservoir. Pertaining to this mussel species, Michigan Natural Features Inventory literature recommends that unnatural hydrological alterations be avoided. A significant winter drawdown could strand and kill individuals of this species and other native mussel species, primarily because they can not relocate (or be relocated) effectively. We do not support implementation of a winter drawdown.

81.    Indeed, in the months preceding the flood, despite knowing the Edenville Dam was not capable of withstanding flooding in the event of a historic flood, the State took action designed to *increase* the water levels on Wixom Lake.

82.    On or about November 25, 2019, EGLE denied a requested permit to draw down the water levels to repair gates in the dam to minimize ice damage in the winter.

83.     Notwithstanding this denial, around November 2019, Defendants began drawing down Wixom Lake, pending the closing of their agreement to transfer ownership of the four hydroelectric dams (including Edenville Dam) to FLTF.

84.     The State subsequently threatened legal action against Defendants, asserting the drawdowns of Wixom Lake were illegal.  On or about December 12, 2019, EGLE issued an Enforcement Notice against Defendants alleging that the November 2019 drawdown of the Wixom Reservoir resulted in surface water drainage of adjacent wetlands and other damage to natural resources, including freshwater mussels. The Enforcement Notice also indicated that Defendants could come into compliance by immediately ceasing the active drawdown of Wixom Lake.

85.     On April 9, 2020, just weeks before the flood, EGLE authorized Defendants to *raise* water levels in Wixom Lake despite the fact that EGLE Dam Safety Division and Defendants were well aware of the Edenville Dam's inability to meet even 50% of the PMF standard.

86.     Concurrent with the present lawsuit, Plaintiffs have also filed a Class Action lawsuit against the MDNR and EGLE in the Michigan Court of Claims.

### *RULE 23 CLASS ACTION ALLEGATIONS*

87.     Plaintiffs bring this action pursuant to FED R. CIV. P. 23(b)(1), (2) and (3) on behalf of the following putative Class defined as follows: ***Any and all persons who suffered bodily injury, emotional distress or property damage from flooding resulting from the May 2020 breach of the Edenville or Sanford Dams.***

88.     Numerosity: The putative Class members are so numerous that joinder of all members in the case would be impracticable.

89.     Commonality/Predominance: There is a well-defined community of interest among Class members and common questions of both law and fact predominate in the action over any

questions affecting individual members. These common legal and factual questions, include, but are not limited to, the following:

a. Whether Defendants' owed a duty of care to the Class Members in operating/managing/regulating the Edenville and Sanford Dams; and if so whether that duty included operating/managing/regulating the Dams in a reasonably safe manner prior to and including Tuesday, May 19, 2020; and if so, whether one or more Defendants breached a duty and proximately caused the dam failures as alleged and floodwater damages to the Class;

b. Why the Edenville and Sanford dams failed on Tuesday, May 19, 2020 including identifying any intervening and superseding causes;

c. Whether the failure of the Edenville and Sanford Dams on Tuesday, May 19, 2020 was the result of unreasonable conduct by Defendants;

d. Whether the Edenville and Sanford Dams prior to and/or on Tuesday, May 19, 2020 constituted an actionable nuisance under the laws of the State of Michigan;

e. Whether the flood waters that resulted from the failure of the Edenville and Sanford dams on Tuesday, May 19, 2020 constituted an actionable trespass under the laws of the State of Michigan;

f. Whether the evacuation resulting from the Dam failures and flood waters is compensable as an interface with the use and enjoyment of property, and if so, the criteria for qualifying for such compensation;

g. Whether Defendants Lee W. Mueller, Michael W. d'Avenas, Stephen B. Hultberg and any other individuals are personally liable for their actions in operating and poorly maintaining the Edenville and Sanford Dams, including the resulting flood, evacuation and property damage resulting from the Dam failures on Tuesday, May 19, 2020;

h. What share of responsibility each Defendant should bear for the losses resulting from the Tuesday, May 19, 2020 flood and continued conditions existing for an unknown period of time thereafter; and

i. Whether declaratory/injunctive relief is proper to remedy the conditions caused by, and still evolving, the Defendants, including abatement or other relief.

90.    *Typicality:* Plaintiffs' claims are typical of claims of the Rule 23 Class they seek to represent in that Plaintiffs and all other members suffered damages as a direct and proximate result

of Defendants' ownership, maintenance and/or regulation of the Dams and conduct preceding Tuesday, May 19, 2020. Plaintiffs' claims arise from Defendants' similar policies, practices, and course of conduct as all other Class members' claims and Plaintiffs' legal theories are based on the same or similar facts.

91.    *Adequacy:* Plaintiffs will fully and adequately protect the interests of the Rule 23 Class and have retained counsel who are qualified and experienced in the prosecution of class actions. Neither Plaintiffs nor their counsel have interests that are contrary to, or conflicting with, the interests of the Rule 23 Class.

92.    *Superiority:* The maintenance of the action as a class action will be superior to other available methods of adjudication and will promote the convenient administration of justice. Moreover, the prosecution of separate actions by individual members of the Class could result in inconsistent or varying adjudications with respect to individual members of the Class and/or one or more of the Defendants.

93.    Because the elements of Rule 23(b)(3) are satisfied in this case, class certification is appropriate. *Shady Grove Orthopedic Assoc., P.A. v. Allstate Ins. Co*., 559 U.S. 393; 130 S. Ct. 1431, 1437 (2010) ("[b]y its terms [Rule 23] creates a categorical rule entitling a plaintiff whose suit meets the specified criteria to pursue his claim as a class action").

94.    Plaintiffs' and the Class have, and continue, to experience harms resulting from Defendants' negligence and the nuisance, including ongoing and prolonged interference with their property rights. Because Defendants acted and refused to act on grounds that apply generally to the Rule 23 Class, injunctive/declaratory relief may also be appropriate in this case with respect to the Class members. Therefore, Class certification pursuant to Rule 23(b)(2) may also appropriate, particularly as to an order to remediate or abate the conditions that caused the nuisance.

95.     Rule 23 (b)(1) applies when separate adjudications will create a risk of decisions that are either inconsistent with or dispositive of other class members' claims. This provision is only appropriate "when 'the party is obliged by law to treat the members of the class alike,' for example when the class touches upon how a utility company interacts with its customers or how the government imposes a tax." *Pipefitters Local 636 Ins. Fund v. Blue Cross Blue Shield of Mich.*, 654 F.3d 618, 633 (6th Cir. 2011) (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 614 (1997)). Here, Defendants were obligated to treat all class members alike vis-à-vis operating and maintaining the Dams.

96.     Similarly, a Rule 23(b)(1)(B) class action is only appropriate when the suit threatens to impair or dispose of the rights and interests of absent class members, as in the case where there is a limited fund available to pay damages. *See generally Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999). Here, it stands to reason that the magnitude of the harm caused by Defendants may outstrip their resources, and a Rule 23(b)(1) class may be the appropriate procedural method to ensure a fair allocation of the limited fund.

97.     Plaintiffs and the members of the Class have suffered damages as a result of Defendants' wrongful conduct as alleged herein, and are entitled to recover for those damages. Furthermore, and absent representative action, Plaintiffs and the Class Members will continue to suffer losses, thereby allowing these violations of law to proceed without remedy.

## COUNT I
## NEGLIGENCE

98.     The allegations contained in Paragraphs 1-97 are realleged and incorporated as if referenced herein.

99.     For years, Defendants were aware that the Edenville and Sanford Dams were structurally unsound yet they failed to take action.  Indeed, this was succinctly recognized by the FERC back in 2018 when it noted:

> Boyce Hydro has, for more than a decade, knowingly and willfully refused to comply with major aspects of its license and the Commission's regulatory regime, with the result that public safety has been put at risk and the public has been denied the benefits, particularly project recreation, to which it is entitled.[9]

100.     Defendants had the duty and ability to avoid harm to Plaintiffs and the proposed Class by using ordinary and diligent care – i.e., heed the warnings of the FERC and take action to fix the failing Dams.

101.     Defendants owed Plaintiffs and Class Members a general duty of care, which at minimum included duties to:

a.  take all reasonable measures to ensure that the Dams were reasonably maintained, operated and within applicable safety standards;

b.  warn Plaintiffs that the Dams were insufficient to withstand rising water levels so they could take steps to prevent damage to their personal property and secure their real property premises with preventative measures such as generators, pumps and sand bags;

c.  properly repair the faulty condition of the Dams to prevent the calamity that occurred on Tuesday, May 19, 2020; and

d.  comply with federal and state regulations and license requirements.

102.     Defendants failed to use such ordinary care and diligence to avert the threatened danger of flooding and sediment transportation by refusing to ensure the safety of the Dams and, correspondingly, the safety of Plaintiffs and those similarly situated.

---

[9] https://www.ferc.gov/CalendarFiles/20180910172800-P-10808-058.pdf (accessed May 29, 2020).

103.    To the reasonable person's mind, it would be apparent that not using ordinary care in the maintenance and upkeep of the Dams would be disastrous to Plaintiffs' living downstream.

104.    Defendants breached their duties to Plaintiffs and the Class.

105.    As a direct and proximate result of Defendants' negligence, Plaintiffs' and Class Members' personal and real property have bene destroyed, lost or damaged, continue to be interfered with and will require extensive remediation. They have also suffered personal injuries and great emotional distress.

106.    As a direct and proximate result of Defendants' breaches, Plaintiffs and Class Members have suffered injury and damages, including, but not limited to, property loss – personal and real property, evacuation, personal injury, emotional distress, diminution in the values of their properties, and related monetary damages associated with the flooding and evacuation.

## COUNT II
## TRESPASS

107.    The allegations contained in Paragraphs 1-106 are realleged and incorporated as if referenced herein.

108.    Plaintiffs and those similarly situated have the exclusive right to exclude others from their private property.

109.    Defendants trespassed upon Plaintiffs' properties without permission with the inundation of water, sediment and debris on or about May 19, 2020 with the failure of the Edenville and Sanford Dams.

110.    Surface water diversion is a physical invasion actionable as a trespass under Michigan law. *Kernen v. Homestead Development Co*, 232 Mich App 503; 591 NW2d 369 (1998).

111.    This unauthorized intrusion upon Plaintiffs' private property caused significant and substantial damage to their properties as well as personal harm.

112.    There is an on-going and increased likelihood of future trespass via intrusion of waters, sediment and debris because of Defendants' failure to maintain the Edenville and Sanford Dams.

113.    Plaintiffs and those similarly situated are entitled to damages against all Defendants as outlined below, and are entitled to injunctive relief to stop the continued and future trespass of water on the properties.

114.    Defendants are liable for trespass and the resulting harm and damages it caused to Class Members for the May 19th Dam failures and resulting floodwaters.

## COUNT III
## NUISANCE

115.    The allegations contained in Paragraphs 1-114 are realleged and incorporated as if referenced herein.

116.    The Dams, being in a prolonged state of disrepair, constituted a nuisance, both public and private and *per se*, under the laws of the State of Michigan. To wit, Defendants operation and maintenance of the Dams in the state that preceded and existed on Tuesday, May 19, 2020 amounted to an activity or condition on one's own property, which activity over a substantial length of time or on successive and repeated occasions causes significant and substantial interference with the property, health, safety or comfort of others. Furthermore, once breached, the Dams deprived Defendants' neighbors of the reasonable and comfortable enjoyment and use of their property, violated the unwritten but accepted law of decency, and endangered the life and health of those neighbors. *Buckeye Union Fire Ins Co v. Michigan*, 383 Mich 630; 178 NW2d 476 (1970).

117.    As a public nuisance, the Dams (1) significantly interfered with the public's health, safety, peace, comfort, and/or convenience, (2) the failure was the result of Defendants' violation of the law, including FERC rules and Defendants' license, and (3) the Dams condition was known or should have been known to Defendants' to be of a continuing nature that produces a permanent or long-lasting, significant effect on the Class's real property rights.

118.    Likewise the Dams subject Defendants to liability for private nuisance because (a) the Class Members have property rights and privileges in respect to the use of the enjoyment interfered with, (b) the invasion of flood waters results in significant harm, (c) Defendants' conduct is the legal cause of the invasion, and (d) the invasion was either (i) intentional and unreasonable, or (ii) unintentional and otherwise actionable under the rules governing liability for negligent, reckless or ultrahazardous conduct. *Adkins v. Thomas Solvent Co*, 440 Mich 293; 487 NW2d 715 (1992), citing 4 Restatement Torts 2d, §§821D-F, §822, pp 100-115; *Cloverleaf Car Co v. Phillips Petroleum Co*, 213 Mich App 186; 540 NW2d 297 (1995).

119.    Plaintiffs and Class Members have been damaged by the nuisance, including but not limited to, (a) being evacuated from their residences; (b) losing the use and enjoyment of their properties during the evacuation, or period of flooding and until remediation occurs; (c) the inability to avail themselves of their properties' value as an asset and/or source of collateral for financing; and (d) damage to real and personal property. *Adkins v. Thomas Solvent Co*, 440 Mich 293; 487 NW2d 715 (1992).

120.    The interference was unreasonable, substantial in nature and has caused significant harm.

121.    Defendants exercised sufficient ownership and/or control over the Dams such that they are culpable and liable for nuisance related damages and interference, including as to Plaintiffs and the Class.

122.    Plaintiffs are entitled to abatement of the nuisance against Defendants as well as monetary damages for the significant injuries and damages they have suffered.

**COUNT IV**
**STRICT LIABILITY**

123.    The allegations contained in Paragraphs 1-122 are realleged and incorporated as if referenced herein.

124.    Defendants operation and prolonged poor maintenance of the Dams, together with amount of water involved, amounted to an abnormally dangerous activity for which strict liability attaches. *See* 3 Restatement Torts 2d, §519, pp 34-36; Prosser & Keeton, Torts (4th ed) §78, pp 513-514.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs, on their own behalf and on behalf of the Rule 23 Class, request judgment as follows:

a. Certifying this action as a class action pursuant to Rule 23 with respect to Plaintiffs' claims;

b. Designating named Plaintiffs as the representatives of the Rule 23 Class, and undersigned counsel as Class counsel for the same;

c. Declaring Defendants' Dams a nuisance and the resulting floodwaters a trespass, for the reasons stated herein;

d. Declaring Defendants' conduct to be negligent and/or willful and holding them liable for Class members' damages;

e. Declaring remediation of Class members' property and abatement relief for the Class or other relief;

f. Creating a limited fund pursuant to FRCP 23(b)(1) to preserve and fairly allocate the limited resources Defendants may possess;

g. Granting judgment in favor of Plaintiffs and against Defendants and awarding Plaintiffs and the Rule 23 Class the full amount of damages available by law, including medical expenses; earnings loss; other expenses; mental anguish; property damage; diminution in the value of realty, including lost rent; incidental and consequential damages, including to businesses; and treble damages;

h. Awarding reasonable attorneys' fees and costs incurred by Plaintiffs in filing this action as provided by Rule 23;

i. Awarding pre- and post-judgment interest to Plaintiffs on these damages; and

j. Awarding such other and further relief as this Court deems appropriate.

## **JURY DEMAND**

Plaintiffs, individually and on behalf of all others similarly situated, by and through their attorneys, hereby demand a trial by jury pursuant to Rule 38 of the Federal Rules of Civil Procedure with respect to the above-entitled cause.

Respectfully submitted,

BUCKFIRE LAW FIRM


*/s/ Michael J. Bonvolanta*
MICHAEL J. BONVOLANTA (P80038)
ROBERT J. LANTZY (P57013)
Buckfire & Buckfire, P.C.
Attorneys for Plaintiffs
29000 Inkster Road, Suite 150
Southfield, MI  48034
(248) 569-4646
(248) 569-6737 (fax)
michael@buckfirelaw.com
robert@buckfirelaw.com

Dated: June 2, 2020